FILED

DCHF

JUN 25 2015

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re        )  Case No. 14-14343-B-13
          )
Richard William Kelley,   )  DC No. PLF-1
          )
    Debtor.   )
_____)

**MEMORANDUM DECISION REGARDING DEBTOR'S MOTION
TO VALUE COLLATERAL OF PENSCO TRUST COMPANY**

Peter L. Fear, Esq., of Fear Law Group, P.C., appeared on behalf of the debtor, Richard Kelley.

Russell W. Reynolds, Esq., of Coleman & Horowitt, LLP, appeared on behalf of the respondent, Pensco Trust Company.

   Before the court is a motion (the "Motion") filed by the debtor, Richard Kelly (the "Debtor") to value the collateral of Pensco Trust Company ("Pensco").[1]  Pensco holds a loan secured by a second priority trust deed (the "Pensco Claim") against the Debtor's residence located in Clovis, California (the "Property").  The Debtor contends that the fair market value of the Property at the commencement of the case was less than the debt secured by the first priority trust deed.  If true, then the Pensco Claim would be wholly unsecured and the Debtor could provide for the Pensco Claim through his chapter 13 plan as a class seven general unsecured claim pursuant to the authority of *Zimmer v. PSB Lending Corporation (In re Zimmer)*, 313 F.3d 1220-27 (9th Cir. 2002) and *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 40-41 (9th Cir. BAP 1997).  The Debtor and Pensco offered competing appraisals prepared by competent and experienced appraisers.  For the reasons set forth below, the court need not determine the actual fair market value ("FMV") of the Property.  However, after an evidentiary

---

[1] The full name of the respondent is listed as Pensco Trust Company Custodian FBO Ronald D. Landskroner IRA LA1AE as Servicer for or Successor to Pensco Trust Company Custodian FBO Ronald D. Landskroner IRA LA1AE.

1  hearing, the court is persuaded that the Pensco Claim is wholly unsecured.

2      This memorandum decision contains the court's findings of fact and conclusions

3  of law required by Federal Rule of Civil Procedure 52(a), made applicable to this

4  contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c).  The

5  court has jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. §§ 506 &

6  1322[2] and General Orders 182 and 330 of the U.S. District Court for the Eastern District

7  of California.  This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (L) &

8  (O).

9  **BACKGROUND AND FINDINGS OF FACT.**

10     **The Property.**  The Property consists of the Debtor's home and several

11  outbuildings on approximately 8.22 acres located just outside the boundaries of Clovis,

12  California.  The Debtor's home, built in 1984, is a single-story 2,133 square-foot ranch

13  style house with four bedrooms and two bathrooms (the "House").  Approximately one-

14  quarter of the Property, about two acres, functions as a storm drainage or ponding basin.

15  It is  substantially below grade and is limited in use (the "Ponding Basin").[3]  The Debtor

16  stated the FMV of the Property as $447,703 on his Schedule A.  Ocwen holds the senior

17  deed of trust securing a mortgage in the amount of $485,218.77.[4]

18

19  _____

20  [2]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy
Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-
21  9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy
Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat.
22  23.

23  [3]The Ponding Basin has steeply sloped sides and lies approximately 20 feet below the
surface of the surrounding Property.  The Debtor grazes horses in the Ponding Basin during the
24  winter, and has used it in the past for paint ball activities.
25

26  [4]The Debtor submitted the mortgage account statement from Ocwen Loan Servicing,
LLC, dated the month prior to the filing of the bankruptcy petition and Pensco stipulated that the
27  indebtedness reflected in that statement, of $485,218.77, was an accurate representation of the
balance owing on the senior deed of trust.  No evidence was offered regarding property taxes or
28

2

1   The Debtor is in the business of training and boarding horses.  At the time of trial

2   he was boarding 20 horses.  He also uses the Property as a venue for parties and other

3   events.  The House and the well, water system, and septic system (the "Infrastructure")

4   were located on the Property at the time the Debtor purchased it.  In addition, the

5   Property includes some barns and other structures that the Debtor uses in his business

6   (collectively, the "Outbuildings").  Two of those structures, identified in this proceeding

7   as "Barn #1" and "Barn #4," were on the Property when the Debtor purchased it.

8   The Debtor subsequently added fence panels to create stalls and awnings to Barn

9   #1, which contains eight stalls, a tack room and a three-quarter bath.  Barn #4 contains a

10  shop, pole barn, and caretaker's unit.  In or about 1999, the Debtor had another building,

11  "Barn #2," which he refers to as a "mare motel," constructed by a local firm at a cost of

12  $13,200.  This structure is not anchored on a permanent foundation and has no integral

13  power source.  In or about 2010-11, a different local construction firm built "Barn #3" at

14  a cost of $12,500.  This building is constructed of steel, sits on concrete piers, and has

15  20 stalls formed with portable panels.  The Property also has a 100' x 225' arena,

16  constructed with portable panels and T-Posts, and a round pen built with telephone poles

17  and panels.

18  **The Appraisals.**   In arriving at an appraisal of the FMV of real property, an

19  appraiser may use a procedure by which the subject property is compared to similar

20  properties in the neighboring area that have been sold within a proximate time frame.

21  These similar, or comparable, properties are generally referred to as "Comps."[5]

22  However, because no two properties are identical, adjustments must be made to the

23  value of the Comps to account for differences in the properties, such as location, lot and

24

25  _____

26  any other senior encumbrance.

27      [5]Comparable (often referred to as "comp"): "A piece of property used as a comparison to
    determine the value of a similar piece of property.–comparable, adj." *Blacks Law Dictionary*,
28  (10th ed. 2014).

3

1   residence size, improvements such as garages, patios and decks, pools, and so on.

2   Essentially, the appraiser takes the known value, such as the selling price, of a Comp

3   and, consistent with the specific characteristics of the subject property, adjusts the

4   Comp's valuation up or down (hereinafter, the "Adjustments"). In other words, the

5   appraiser answers the question, "If this Comp had the same characteristics as the subject

6   property, after the Adjustments, what would it be worth?" The answer to that question

7   yields the "appraised" value of the subject property.

8        Here, the Debtor hired two separate appraisers to evaluate the Property, one of

9   whom appraised the Property at $401,000, and the second at $390,000. For the purposes

10  of this decision, the court has considered only the higher ($401,000) appraisal prepared

11  by Shawn F. Schulz (the "Debtor's Appraisal"). Conversely, Pensco's appraiser,

12  Barbara Radcliffe, valued the Property significantly higher at $600,000 (the "Pensco

13  Appraisal"). Each of the appraisers essentially agreed on the value of the House. They

14  also agreed on the value of the Infrastructure. They both recognized the existence of

15  various Outbuildings and the Ponding Basin. However, they differed substantially on

16  the value of the Outbuildings. They disagreed on the Ponding Basin's effect on the use

17  and value of the Property. They also differed as to the appropriate Adjustments based

18  on the Property's location, size, and shape (the "Site Characteristics").

19       Both of the appraisers, Shawn Schulz ("Schulz") and Barbara Radcliffe

20  ("Radcliffe") are licensed and experienced professionals and the parties stipulated to the

21  experts' qualifications. Schulz and Radcliffe, in their appraisals, happened to select two

22  of the same properties as Comps. They both used 9255 E. Bullard Ave., Clovis ("Comp

23  A"), and 5945 N. McCall Ave., Clovis ("Comp B"). Since the appraisers substantially

24  agreed on the value of the House and the Infrastructure, the $200,000 gap between their

25  valuations of the Property is attributable to the various Adjustments they made based on

26  the Outbuildings, and on the Site Characteristics. The difference between the two

27  appraisers' valuation of the Property and their relative Adjustments was dramatic.

28  While Schulz valued the Property at $401,000, Radcliffe valued the Property at

4

1    $600,000.  Schulz' net Adjustment to the value of Comp A was 12.3% and to Comp B,

2    3.6%.  Radcliffe's net Adjustments were substantially higher, 68% for Comp A and 57%

3    for Comp B.  Both appraisers were asked to explain the basis for their adjustments, and

4    Schulz opined that large adjustments should cause one to question whether a Comp is

5    truly "comparable."  This decision turns on their respective abilities to explain that

6    difference.

7    **ISSUES PRESENTED.**

8           The Motion is described as a motion to value Pensco's collateral, but that title is a

9    misnomer because the actual value of the Property is irrelevant to the outcome of this

10   contested matter.  The Debtor is actually asking this court to rule, based on the evidence,

11   that the $210,000 Pensco Claim is wholly unsecured, meaning that the Claim may be

12   treated as a general unsecured claim, instead of a secured claim, in the Debtor's chapter

13   13 plan.  If the Pensco Claim is determined to be wholly unsecured, then Pensco is not

14   the "holder of a secured claim" whose rights are subject to the "antimodification"

15   protection of § 1322(b)(2).[6]  *In re Zimmer, supra*, 313 F.3d at 1227.  Conversely, unless

16   the Pensco Claim is wholly unsecured, the chapter 13 plan must provide for full

17   payment of Pensco's Claim as a secured claim.[7]  If the Pensco Claim is treated as a

18   general unsecured claim, then Pensco will receive little or nothing on account of its

19   claim through the Debtor's chapter 13 plan and the Debtor will receive a discharge of

20

21   _____

22          [6]Section 1322(b) provides in pertinent part:

23                 Subject to subsections (a) and (c) of this section, the plan may –

24                 . . .
                   (2) modify the rights of holders of secured claims, other than a claim secured only
25          by a security interest in real property that is the debtor's principal residence . . . .

26          [7]Bankruptcy Code § 1322(b)(2) prevents the Debtor from bifurcating or "stripping down"
27   the Bankers' claim to a partially secured and partially unsecured claim based on the value of its
     collateral. *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228
28   (1993).

5

his debt to Pensco upon completion of the plan.[8]  Thus, for purposes of granting or denying the Motion, this court does not need to determine the actual value of the Property.  It only needs to decide whether or not the value of the Property, at the commencement of this case, was greater than, or less than, $407,158.78, the amount of the senior secured debt owed to Ocwen.  *In re Serda*, 395 B.R. 450, 453 (Bankr. E.D. Cal. 2008).

## ANALYSIS AND CONCLUSIONS OF LAW.

**Applicable Law.**  The Debtor seeks to value Pensco's interest in the Property based on § 506(a)(1), which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*

(Emphasis added.)

When the Debtor intends to remain on the Property, the proper valuation of the Property under § 506(a) is the FMV.  *Taffi v. United States of America (In re Taffi)*, 96 F.3d 1190, 1192 (9th Cir. 1996).  Here, the FMV is not the "replacement" value because the Property is not being replaced.  Neither is it the "foreclosure" value because no foreclosure is intended in the chapter 13 plan.  *Id.*  The FMV is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time."  *Id.*

/ / /

/ / /

---

[8]The Debtor's chapter 13 plan, which this court confirmed on December 15, 2014, proposes to pay 0% to Class 7 general unsecured creditors.

6

**The Burden of Proof.** Pensco ultimately bears the "burden of proof with respect to the amount and extent of its lien," and must do so by a preponderance of the evidence.[9] *In re Sneijder*, 407 B.R. 46 (Bankr.S.D.N.Y. ,2009). The Debtor is currently living on the Property and intends to stay there. While he has the option in chapter 13 to surrender the Property, his chapter 13 plan provides that he will continue to make the mortgage payments to Ocwen outside of the plan. The "purpose of the valuation" and the "proposed disposition or use" of the Property is to determine its value as an owner-occupied property. (§ 506(a)(1).) Generally, owner-occupants will try to realize the highest and best price for their property in an open market, which illustrates the inherent contradiction in this kind of proceeding where it is in a debtor's interest to advocate for its lowest valuation. However, in this case the court notes that the Debtor's opinion of the Property's value, as reflected in his Schedule A, is significantly higher than that of either of his experts.

The court is essentially being asked to weigh two conflicting sets of testimony and evidence and decide which is the most credible. As the trier of fact, the bankruptcy court is entitled to evaluate a witness's credibility and to determine whether to believe the testimony or not. *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 731 (9th Cir. BAP 1999), *aff'd mem.* 5 F. App'x 743 (9th Cir. 2001). "When the testimony of a witness is not believed, [the bankruptcy court, as] the trier of fact[,] may simply disregard it." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984).

Here, Pensco offered the Pensco Appraisal, supported by Radcliffe's testimony, which, had the court found it persuasive, could have resulted in a ruling in Pensco's favor. However, while Radcliffe was able to testify with specificity as to much of the information in her appraisal, she struggled when asked on cross-examination to explain the Adjustments she made to the Comps on account of the Outbuildings and Site

---

[9]While the Debtor bears the initial burden of proof of overcoming any presumption established by the stated value in the secured creditor's proof of claim, in this case, Pensco did not file a proof of claim.

7

1    Characteristics.  Her inability to answer some of the straightforward question asked by

2    Debtor's counsel seriously undermined the persuasive value of her testimony.

3       **Application of the Facts.**  Schulz and Radcliffe substantially agreed on the value

4    of the House and Infrastructure however differed wildly as to the value of the Property's

5    Outbuildings and Site Characteristics.  In summary, the differences between the two

6    appraisers' Adjustments to the Comps based on the House and Infrastructure were

7    minor, their Adjustments to Comp A differed by only $1,500, and to Comp B, by only

8    $7,000.  However, the differences on account of the Site Characteristics and

9    Outbuildings was huge, $88,000 for the former, and more than $100,000 for the latter.

10      Radcliffe's home is in the same neighborhood as the Property.  She keeps two

11   horses on approximately two acres and was familiar with the Property.  On direct

12   examination, Radcliffe presented articulate testimony as she referred to the Debtor's and

13   Pensco's exhibit binders.   When asked to comment on some of the problems she

14   perceived with the Debtor's Appraisal, Radcliffe asked, "Can I, can I get my working

15   copy of it?"  Based on her subsequent testimony, Pensco then submitted for admission

16   several additional exhibits consisting of parcel maps that Radcliffe had pulled from the

17   county records which showed the relative shapes of some of the comparable properties.

18   She described the factors that affected the Adjustments she made to the Comps on

19   account of factors such as, the specific locations, parcel configurations, proximity to city

20   limits, traffic flow, and water availability, and perceived marketability, of the properties.

21   She explained, in similar detail, various deficiencies she perceived in the Debtor's

22   Appraisal.

23      Radcliffe's testimony became difficult to follow when she tried to explain the

24   significant discrepancies in the competing appraisals based on the Site Characteristics

25   and the Outbuildings.  While Schulz made a $12,000 positive Adjustment for the

26   Property's size, Radcliffe gave the Comps a positive Adjustment of $100,000, more than

27   eight (8) times that given by Schulz.  In her testimony, Radcliffe minimized the effect of

28   the Ponding Basin–a quarter of the property's acreage located 20 feet below grade–on

8

the value of the Property.  She described it as a "neutral" characteristic, neither substantially adding to, nor detracting from, the Property's value.  The court found this portion of Radcliffe's testimony difficult to believe.

On cross-examination Radcliffe had difficulty and became evasive when asked to explain the relatively high value she assigned to the Outbuildings.  Radcliffe initially testified that she had examined and measured each of the Debtor's barns and arenas.  However, when Debtor's counsel, Peter Fear ("Fear"), asked her what value she gave to Barn #1, she responded that she gave it "substantial value," because it was a "working barn, it would stay with the property."  Fear again asked, "How much value did you give to Barn #1?"  Radcliffe paused, and responded, "I didn't bring my notes for that."

Fear then asked, "Do you have notes somewhere that would show that?"

Radcliffe responded, "I have it in my working file," but that she had not brought her working file to the hearing.

Undaunted, Fear asked Radcliffe to recall, as best she could, *approximately* how much value she had attributed to Barn #1.  "I don't want to say without referring to the working file," she responded.  Again, Fear stated that he was just trying to find out if Radcliffe had an approximate idea, but she effectively terminated the line of questioning, "I couldn't answer that question."

Moving on, Fear asked Radcliffe what values she had attributed to the other Outbuildings on the Property, specifically Barns #2, #3, and #4.  Again Radcliffe's response to each question was evasive because she had not brought her "working file."

Finally, in an effort to get some answers regarding Radcliffe's valuation of the Outbuildings, Fear asked, "How much did you give to all of the outbuildings as a cumulative?"  After a lengthy pause, Radcliffe responded, "I don't know that I can answer that specific question but I know it's around $140,000."

/ / /

/ / /

/ / /

9

1   Radcliffe asserted that she had indeed separately valued the Outbuildings in order
2   to arrive at a cumulative value of $140,000.  However, it is difficult to reconcile her
3   grasp of the specific details of other aspects of her appraisal with her inability to even
4   suggest the values she ascribed to the different Barns.

5   **CONCLUSION.**

6   As noted above, the court only needs to determine whether the Property is worth
7   $1 more or $1 less than the stipulated amount of the senior lien.  As between Pensco's
8   valuation of $600,000, and the valuation provided by the Debtor's appraiser, $401,000,
9   the court is persuaded that the Debtor's valuation is the more accurate.  Even the
10  Debtor's estimate of the Property's value, as reflected in Schedule A, which is
11  substantially higher than the Debtor's Appraisal, would still support a ruling in favor of
12  the Debtor.  Pensco's valuation of the Outbuildings, as reflected in the Comp
13  adjustments, was five (5) times that of the Debtor's for Comp A, and a remarkable
14  twenty-four (24) times the Debtor's for Comp B.  Radcliffe's vague and evasive
15  explanation of how she valued the Outbuildings was not persuasive.  Based on the
16  above, the court is persuaded that the FMV of the Property at the commencement of this
17  bankruptcy case was less than the amount of the first priority secured debt.  Even if
18  Schulz understated the FMV by thousands of dollars, Pensco's claim still appears to be
19  wholly unsecured and may be treated as such in the Debtor's chapter 13 plan.
20  Accordingly, the Motion will be granted.

21  Dated: June _____25____, 2015

23  _____
    W. Richard Lee
24  United States Bankruptcy Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Instructions to Clerk of Court**
**Service List - Not Part of Order**/Judgment

     The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below.  The Clerk of Court will send the Order via the BNC or, if checked_____, via the U.S. mail.

     Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and _X__ Other Persons Specified Below:

Russell W. Reynolds, Esq.
Attorney at Law
499 West Shaw, Suite 116
Fresno, CA 93704

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare Street, Suite 1401
Fresno, CA 93721